*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

RMH SOLUTIONS LLC,

        Plaintiff/Counterdefendant-Appellee,

V

CHARTER TOWNSHIP OF CLINTON, CLINTON TOWNSHIP FIRE-RESCUE-EMS, and CHUCK CHAMPAGNE,

        Defendants/Counterplaintiffs-
        Appellants.

UNPUBLISHED
July 15, 2026
1:02 PM

No. 374887
Macomb Circuit Court
LC No. 2024-001106-CZ

Before: GADOLA, C.J., and RIORDAN and LETICA, JJ.

PER CURIAM.

In this action disputing compliance with building and fire codes, defendants/counterplaintiffs, Charter Township of Clinton (the Township), Clinton Township Fire-Rescue-EMS (CTFR), and Chuck Champagne, the Fire Marshal of the CTFR, (collectively defendants), appeal as of right the judgment approving the evacuation plan of plaintiff/counterdefendant, RMH Solutions LLC (plaintiff), and allowing it to obtain I-1 condition 2 occupancy for the second and third floors of its facility. We vacate and remand for further proceedings.

## I. FACTUAL AND PROCEDURAL HISTORY

This matter arises from plaintiff's operation of an assisted care and memory care facility for the elderly, known as The Parkdale Assisted Living & Memory Care (the facility). In 2019, plaintiff purchased a former four-story hotel conditioned upon the receipt of authorization to redevelop the property into an assisted care and memory care facility. Plaintiff sought to rezone the property from "General Business" (B-3) to "Special Purpose (Nursing Homes)" (SP-1), and a variance. In May 2019, the Charter Township of Clinton Zoning Board of Appeals (the ZBA) approved plaintiff's request for a variance, and the Charter Township of Clinton Planning Commission (the Commission) approved plaintiff's site development plan. The Charter Township

of Clinton Board of Trustees (the Board) also approved the rezoning of the property and adopted an ordinance to amend the map and rezone the property from B-3 to SP-1.

After obtaining the necessary approvals, plaintiff closed on the purchase of the property and commenced development of the facility. The facility was subject to various fire code and building code requirements, including the 2015 International Fire Code (2015 IFC) and the 2015 Michigan Building Code (2015 MBC). The Charter Township of Clinton Building Department (the Building Department) reviewed plans for the facility in May 2020. The first floor included an adult foster care and memory care unit and was classified as I-1 condition 2 occupancy. The upper three floors were classified as I-1 condition 1 occupancy. The Building Department issued a temporary certificate of occupancy in May 2021 and a final certificate of occupancy in June 2021.

Plaintiff opened the facility in June 2021. The first floor of the facility included two adult foster care homes, each with 20 beds, for persons needing "24-hour supervision and care." The second, third, and fourth floors were classified as senior independent living communities. It was alleged that the Township's fire marshal inspected the facility at least four times a year since the facility opened, and that plaintiff passed the inspections "without issue." In November 2023, Champagne determined operating an assisted living facility on the upper three floors violated the 2015 IFC. The letter was written after an EMS run at the facility. Plaintiff's staff called for assistance because of the inability to lift an obese resident. Champagne also observed several wheelchairs and scooters on the same upper floor. He explained that, although buildings in the "I" Use Group may have residents "who cannot self[-]preservate [sic] during any emergency," R-2 buildings do not allow the inclusion of residents requiring "assistance to evacuate." Champagne provided two options for the facility to become compliant with the 2015 IFC:

1. Discontinue operations as a home for the aged on floors 2, 3 and 4, and provide an independent living facility the Parkdale was originally granted for occupancy.

2. Through a code analysis, make the necessary facility changes that will provide the required protections that are required for an I Use Group.

The Township and the facility attempted to resolve the situation, including reassessing residents to determine who was unable to self-evacuate during an emergency. Champagne stated the facility was to conduct an evacuation drill "to address those residents that cannot evacuate the building without assistance." In February 2024, the facility retained a structural engineering firm and Robert Waltz, to "provide a code analysis of the building," and determined the facility "meets and/or requires only minor modifications to meet the I use group requirements." Waltz opined the facility's classification as R-2 was an error. Waltz determined the facility "could not satisfy 1-2 requirements" because of "the wood framing of the upper floors[.]" Nonetheless, Champagne noted that he was able to revoke the certificate of occupancy in his role as a building official, under section 111.4 of the 2015 MBC, if the situation was not remedied "immediately."

In March 2024, plaintiff filed its complaint against defendants seeking injunctive relief and damages. Plaintiff raised several counts, alleging, among other things, the Township's ordinances were unconstitutional, defendants' actions constituted an inverse condemnation, and plaintiff was entitled to a declaratory judgment and equitable relief allowing it to continue to operate the facility.

Plaintiff also moved for an ex parte temporary restraining order (TRO) and for a status quo order. Defendants opposed the motion for a TRO and filed an answer, affirmative defenses, and a counterclaim alleging a public nuisance claim.

Although the parties requested a TRO and moved for summary disposition, the trial court held these matters in abeyance and engaged in settlement negotiations with the parties. Ultimately, the parties stipulated to an order defining the issues to be decided by the trial court:

> Whereas Plaintiff is housing residents on the second, third and fourth floors and some of these residents are bed bound and incapable of self-evacuating, some residents can evacuate with some assistance and others are capable of evacuating without any assistance in the case of an emergency;

> Whereas the first floor is regulated by the State of Michigan and to that end is not the subject of this stipulated order;

> Whereas the second through fourth floors of Plaintiff's building are currently approved as an I-1 condition 1 but those floors may be able to be upgraded to I-1 condition 2;

> Whereas the parties seek the ruling of the Court as to whether certain evacuation methods are permissible in an I-1 condition 2 use before Plaintiff undergoes the cost of improvements to change the use occupancy to I-1 condition 2;

> Whereas the Defendant alleges that the fourth floor is incapable of becoming an I-1 condition 2 occupancy and Plaintiff has agreed that it will not house people incapable of self-evacuating without assistance on the fourth floor for purpose of this order and potential resolution of this matter only; and

> Whereas the parties have agreed to brief the below issue with oral argument to be held at a date to be set by the Court for the Court to render a decision;

IT IS HEREBY ORDERED THAT:

1. The parties shall submit briefs by [November 18, 2024,] on whether the following constitutes "limited assistance" pursuant to the 2015 Building Code and 2015 International Fire Code:

   a. Housing of an unlimited amount of bed[]bound residents on the [second] and [third] floors where there are 33 rooms on the [second] floor and 42 rooms on the [third] floor;

   b. The use of two Evac Plus Chairs model 300H per stairwell for floors [two and three] where there are three stairwells per floor (for a total of [12] chairs) with assistance of at least eight staff members on the second and third floors at all times to evacuate residents in the case of an emergency.

2. The parties may file one response brief to the other party's brief by [November 29, 2024].

3. Oral argument shall be held on [December 4, 2024] . . . .

4. The [c]ourt shall issue a written opinion and order with its findings of fact and law as to the issue of whether [p]laintiff's plan is only "limited assistance" and complies with the 2015 Building Code and 2015 International Fire Code. This opinion and order shall be a final order for appellate purposes.

5. Neither party waives any rights or claims asserted in the present action if upon appeal this action is remanded back to the [trial court], unless the Court of Appeals directs the [trial court] to enter an order that otherwise eliminates the asserted rights or claims. Specifically, [p]lantiff reserves the right to resurrect claims regarding the fourth floor and monetary damages and [d]efendants reserve the right to resurrect its counterclaim if the matter is remanded and the Court of Appeals does not direct otherwise.

Plaintiff filed a brief in support of a finding that it complied with the requirements of an I-1 condition 2 occupancy for the upper three floors. It challenged defendants' objection to a finding that plaintiff complied with limited assistance requirements and defendants' position that the facility should be an I-2 occupancy. Defendants countered that plaintiff's proposed plan did not meet the requirements of "limited assistance" under the I-1 condition 2 occupancy.

The trial court issued an opinion and order, determining that the residents were unable to self-evacuate and the facility did not meet the requirements of the I-1 condition 1 occupancy. The trial court stated the building and fire codes did not define the terms "bedridden" and "limited assistance," and it supplied dictionary definitions for these terms. The trial court concluded:

> Plaintiff proposes to have at least eight staff members on the second and third floors who will be able to maneuver residents from their beds to evacuation chairs. The evacuation chairs can then be wheeled to a stairwell to shelter in place as would residents in wheelchairs. Consequently, plaintiff's plan—including the necessary updates to the second and third floors of the facility from Institutional Group I-1 Condition 1 occupancy designation to Institutional Group I-1 Condition 2 occupancy designation—would permit bedridden residents to occupy the second and third floors.

Defendants moved for reconsideration of the trial court's opinion and order. The trial court held a hearing, and the parties indicated they prepared a judgment[1] for the court to enter, but only approved as to form, which would close the case. The trial court subsequently issued an opinion and order denying defendants' motion for reconsideration:

---

[1] Additional motions, including a motion for summary disposition, were filed. This judgment, closing the case, alleviated a decision on those matters.

-4-

As a preliminary matter, plaintiff is providing custodial care for the residents on the second and third floors. The limited record does not establish plaintiff is providing medical care to these residents. Consequently, Institutional Group I-2 is not implicated.

As noted, Institutional Group I-1 Condition 2 includes residents requiring "limited verbal or physical assistance" to evacuate. The nature of the limited physical assistance is not constrained to non-weight bearing assistance. Defendants' reliance on the more restrictive *Law Insider* online dictionary definition of "limited assistance", being contrary to the plain language of the Michigan Building Code and International Fire Code, is misplaced.

The act of guiding/assisting the transfer of residents from their beds to the Evacu+Chairs constitutes the provision of limited physical assistance. The subsequent use of the Evacu+Chairs to facilitate the more expeditious movement of residents, as would be necessary in an emergency situation, does not transform the level of physical assistance being provided.

Significantly, defendants acknowledge the second-floor stairwell has sufficient space to provide a refuge area for more people than can reside on the second floor. While the third-floor stairwell purportedly lacks sufficient space to provide a refuge area for all the people that can reside on the third floor, defendants ignore the fact that all of these residents will not be seeking refuge at once. Indeed, plaintiff has proposed providing sufficient staff to immediately begin evacuating those needing such assistance. As such, the residents will not be sheltering in place in the stairwells to await rescue.

Moreover, defendants' third-floor refuge area capacity calculations are limited to stairwell landing spaces. However, Michigan Building Code § 420.4.1 provides the calculations are to also consider "corridors, lounge or dining areas and other low-hazard areas". Inasmuch as defendants' calculations exclude these other potential areas, the calculated capacities do not prove a lack of sufficient refuge area exists on the third floor.

The trial court entered a judgment dismissing the parties' claims. This judgment provided that plaintiff was to "complete all improvements to reach I-1 Condition 2 status on the second and third floors by June 1, 2025." And plaintiff was only permitted to house residents capable of self-evacuation on the fourth floor. Defendants now appeal.

II. ANALYSIS

A. STANDARDS OF REVIEW

"This Court reviews de novo the trial court's conclusions of law and equitable decisions." *Sweet Air Investment, Inc v Kenney*, 275 Mich App 492, 496; 739 NW2d 656 (2007). "This Court reviews de novo a trial court's ruling in a declaratory action." *Smith v Straughn*, 331 Mich App 209, 214; 952 NW2d 521 (2020). "De-novo review means [this Court] review[s] the legal issue independently, without deference to the lower court." *Bowman v Walker*, 340 Mich App 420, 425;

986 NW2d 419 (2022) (quotation marks and citation omitted). "The circuit court's findings of fact . . . are reviewed for clear error . . . ." *Ladd v Motor City Plastics Co*, 303 Mich App 83, 92; 842 NW2d 388 (2013). "A finding is clearly erroneous if there is no evidentiary support for it or if this Court is left with a definite and firm conviction that a mistake has been made." *Chelsea Investment Group, LLC v City of Chelsea*, 288 Mich App 239, 251; 792 NW2d 781 (2010).

This Court interprets the applicable building and fire codes under the rules of statutory construction. See *Gora v Ferndale*, 456 Mich 704, 711; 576 NW2d 141 (1998); *Detroit v Walker*, 445 Mich 682, 691; 520 NW2d 135 (1994). Statutory interpretation presents a question of law which the appellate court reviews de novo. *O'Neal v St John Hosp & Med Ctr*, 487 Mich 485, 493; 791 NW2d 853 (2010). The proper interpretation and application of ordinances are also reviewed de novo. *Gmoser's Septic Serv, LLC v East Bay Charter Twp*, 299 Mich App 504, 509; 831 NW2d 881 (2013).

> When interpreting the meaning of a statute, [the appellate court's] primary goal is to discern the intent of the Legislature by first examining the plain language of the statute. Statutory provisions must be read in the context of the entire act, giving every word its plain and ordinary meaning. When the language is clear and unambiguous, [the appellate court] will apply the statute as written and judicial construction is not permitted. [*Driver v Naini*, 490 Mich 239, 246-247; 802 NW2d 311 (2011) (footnotes and citations omitted).]

"Courts must give effect to every word, phrase, and clause in a statute, and must avoid an interpretation that would render any part of the statute surplusage or nugatory. Further, [the appellate court] give[s] undefined statutory terms their plain and ordinary meanings. In those situations, we may consult dictionary definitions." *Koontz v Ameritech Servs, Inc*, 466 Mich 304, 312; 645 NW2d 34 (2002).

B. COMPLIANCE WITH THE I-1 CONDITION 2 USE OCCUPANCY CLASSIFICATION

Defendants contend the trial court erred by approving plaintiff's plan to evacuate residents from the second and third floors of the facility because those floors were incompatible with the mandates of an I-1 condition 2 occupancy under the fire and building codes. Defendants also assert the trial court failed to make sufficient findings of fact in reaching its legal conclusions. We agree. Because there was insufficient development of the factual record and factual findings required for appellate review, we remand for proceeding consistent with this opinion. *Jackson v Thompson-McCully Co, LLC*, 239 Mich App 482, 489; 608 NW2d 531 (2000).

"It is unlawful for any owner or agent thereof to keep or maintain any dwelling or part thereof which is a dangerous building[.]" MCL 125.538. Under MCL 125.539, a dangerous building includes, in relevant part:

> [A] building or structure that has 1 or more of the following defects or is in 1 or more of the following conditions:
>
> (a) A door, aisle, passageway, stairway, or other means of exit does not conform to *the approved fire code* of the city, village, or township in which the building or structure is located. [Emphasis added.]

-6-

The parties stipulated regarding the issue the trial court was to resolve, namely, whether plaintiff's proposed evacuation plan for the second and third floors fell within the classification of an I-1 condition 2 occupancy. The trial court was to decide:

[W]hether the following constitute "limited assistance" pursuant to the 2015 Building Code and 2015 International Fire Code:

a. Housing of an unlimited amount of bed[]bound residents on the [second] and [third] floors where there are 33 rooms on the [second] floor and 42 rooms on the [third] floor;

b. The use of two Evac Plus Chairs model 300H per stairwell for floors 2 and 3 where there are three stairwells per floor (for a total of [12] chairs) with assistance of at least eight staff members on the second and third floors at all times to evacuate residents in the case of an emergency.

The upper three floors[2] were approved by the Township as I-1 condition 1 occupancy, and the floors were eligible "to be upgraded to I-1 condition 2[.]" The fourth floor of the facility was "incapable of becoming an I-1 condition 2 occupancy" and plaintiff "agreed that it will not house people incapable of self-evacuating without assistance on the fourth floor."

It is undisputed the facility was required to comply with the 2015 MBC and 2015 IFC. "[B]uilding codes generally are concerned with the use of the land[.]" *Galvan v Poon*, 511 Mich 206, 214; 999 NW2d 351 (2023) (quotation marks and citations omitted). Plaintiff was "charged with knowledge" of the Township's Ordinances and "acquired no vested right to use" the property in an unpermitted manner. *Fass v Highland Park*, 326 Mich 19, 31; 39 NW2d 336 (1949). Importantly, the facility was subject to the 2015 IFC and the 2015 MBC because the Township adopted by reference each code in its ordinances. See Clinton Township Ordinances, §§ 1420.01 and 1610.01.

Section 308 of the 2015 MBC governs Institutional Group I occupancies, which includes buildings used for the supervision or care of persons who "are not capable of self-preservation without physical assistance . . . ." Section 308.3 governs the Institutional Group I-1 classification, providing in relevant part:

**308.3 Institutional Group I-1.** Institutional Group I-1 occupancy shall include buildings, structures or portions thereof for more than 16 persons, excluding staff, who reside on a 24-hour basis in a supervised environment and receive custodial care. Buildings of Group I-1 shall be classified as one of the occupancy conditions specified in Section 308.3.1 or 308.3.2. . . .

---

[2] The parties agreed that the use of the first floor was not pertinent to the case disposition.

* * *

**308.3.1 Condition 1.** This occupancy condition shall include buildings in which all persons receiving custodial care who, without any assistance, are capable of responding to an emergency situation to complete building evacuation.

**308.3.2 Condition 2.** This occupancy condition shall include buildings in which there are any persons receiving custodial care who require limited verbal or physical assistance while responding to an emergency situation to complete building evacuation.

The 2015 IFC includes a similar description for its classification of an Institutional Group I-1 occupancies, stating in relevant part:

**[BG] Institutional Group I-1.** Institutional Group I-1 occupancy shall include buildings, structures, or portions thereof for more than 16 persons, excluding staff, who reside on a 24-hour basis in a supervised environment and receive custodial care. Buildings of Group I-1 shall be classified as one of the occupancy conditions indicated below. . . .

* * *

**[BG] Condition 1.** This occupancy condition shall include buildings in which all persons receiving custodial care who, without any assistance are capable of responding to an emergency situation to complete building evacuation.

**[BG] Condition 2.** This occupancy condition shall include buildings in which there are any persons receiving custodial care who require limited verbal or physical assistance while responding to an emergency situation to complete building evacuation.

Section 202 of the 2015 MBC defines "custodial care" as:

Assistance with day-to-day living tasks; such as assistance with cooking, taking medication, bathing, using toilet facilities and other tasks of daily living. Custodial care includes persons receiving care who have the ability to respond to emergency situations and evacuate at a slower rate and/or who have mental and psychiatric complications.

Under section 308.4 of the 2015 MBC, an Institutional Group I-2 "occupancy shall include buildings and structures used for *medical care* on a 24-hour basis for more than five persons who are *incapable of self-preservation*." This classification includes nursing homes. "Incapable of Self-Preservation" includes persons "who, because of age, physical limitations, mental limitations, chemical dependency or medical treatment, cannot respond as an individual to an emergency situation."

The codes do not define what constitutes "limited verbal or physical assistance" in the context of responding to an emergency to "complete building evacuation." However, the term "limited" is defined as "confined within limits." *Merriam-Webster's Collegiate Dictionary* (12th ed). "Assistance" is defined as "the act of assisting or the help supplied." *Merriam-Webster's Collegiate Dictionary* (12th ed). The term "bedridden" is defined as "confined (as by illness) to bed." *Merriam-Webster's Collegiate Dictionary* (12th ed).

Defendants argue plaintiff's proposed plan did not comply with the requirements of an I-1 condition 2 occupancy because the amount of labor required to evacuate 75 bedridden residents from the second and third floors constituted more than mere "limited assistance." Plaintiff contends the number of bedridden residents suggested by defendants was contrived, asserting residents on the upper floors are not provided any medical assistance and typically relocate to a different facility when their health declines.

The trial court's decision regarding limited assistance was erroneous because the record was unclear regarding the exact number of residents living on the second and third floors who are (1) able to self-evacuate, (2) require assistance to evacuate, and (3) are bedridden or otherwise incapable of evacuating independently or with limited assistance. Without further factual development, the limited record does not enable this Court to decide this issue. *Jackson*, 239 Mich App at 489. Therefore, we vacate the trial court's judgment and remand this case for further proceedings to address the issue defined in the stipulated order.

It is undisputed, and the record evidence supports, that the second and third floors were approved by the Township for classification under I-1 condition 1 occupancy. Plaintiff's purchase of the property was subject to its ability to redevelop the former hotel into the assisted care and memory facility. The ZBA approved a request for a variance, and plaintiff was required to comply with the Township's ordinances and gain approval of its site development plans. The Commission approved plaintiff's site development plan for the property, the Board approved the rezoning of the property, and the Board adopted Clinton Township Ordinance No. 260-A-476 to amend the map of Clinton Township's Ordinances, Part Twelve, which rezoned the property from B-3 to SP-1. The Department of Planning certified the Commission's approval of plaintiff's site development plan and issued a certificate of approval. After obtaining the approvals, plaintiff closed on the purchase of the property. The Building Department reviewed plans submitted by the facility and issued a final certificate of occupancy on June 10, 2021.

The facility opened in June 2021 and routinely passed inspection by the Township's fire marshal at least four times annually since it opened. However, while Champagne was at the facility during an EMS visit on November 29, 2023, he observed an individual on the fourth floor who was unable to self-evacuate because of his weight. He also noticed several wheelchairs and scooters on the fourth floor. The next day, Champagne, who was authorized to revoke the facility's certificate of occupancy as a building official under section 111.4 of the 2015 MBC, notified the facility the operations in the assisted living areas on the upper three floors violated the 2015 IFC. Champagne offered two options for the facility to achieve compliance: (1) ceasing operations "as a home for the aged" on the upper three floors and providing instead "an independent living facility," which it "was originally granted for occupancy," or (2) "make the necessary facility changes that will provide the required protections that are required for an I Use Group."

Counsel for the facility stated the upper three floors were senior independent living communities, but not for individuals requiring 24-care care. Counsel represented that these residents "are screened for their functional ability" for plaintiff to "determine whether any services or staffing support are appropriate to allow them to live independently." If these residents are unable to reach the first-floor dining area, the facility's policy is "to assess that resident's care needs" and either move the resident to the first floor or provide "additional support."

An engineer retained by the facility found the facility was unable to achieve Institutional Group I-2 status because of "the wood framing of the upper floors[.]" John Donoian, an architect, asserted the upper three floors could achieve compliance with "Group I-1 Condition 2" requirements with minimal modifications, including (1) installation of a double door system "at a halfway point in each corridor on each floor . . . of the Building," with each door being interfaced "with the exiting Fire alarm system for emergency actuation," and (2) a "net area of 15 Sq. Ft. Refuge area shall be demarcated within each Fire Exit stair."

Notably, the Township oversaw a fire drill at the facility on May 7, 2024. Of 58 residents living on the third and fourth floors, 37 residents were "[n]ot capable" of self-evacuating during an emergency. Of the remaining 21 residents, three residents required assistance to evacuate, and 18 residents were able to self-evacuate. However, at the time, the second floor was under renovation and unoccupied. In any event, the results for the third floor indicated eight residents were capable of self-evacuating and 23 residents were not capable of self-evacuation. Specifically, 16 of those 23 residents were "Bed Bound." Regarding the fourth floor, 10 residents were capable of self-evacuation, three residents required assistance, and 14 were not capable of self-evacuation (two of which were "Bed Bound").

In attempting to achieve compliance with I-1 condition 2 occupancy, plaintiff installed evacuation chairs allowing "for easy evacuation over the staircase," and an evacuation board allowing "for sliding over the staircase until the person is evacuated from the building[.]" Those measures were in addition to the installation of "an additional set of automatic doors," which would split "a larger hallway into two."

Defendants alleged that having only eight staff members evacuate residents from the upper floors of the facility encompassed more than "limited assistance." Rather, the lift transfers involved removing a resident from bed, placing him or her in a wheelchair, moving him or her to a stairwell, placing him or her in an evacuation chair, and delivering him or her to the first floor to exit the building. This constituted a labor-intensive effort. Defendants maintained there were 37 residents "incapable of evacuating," and not enough staff available to assist with the evacuations. Moreover, the time frame involved for each resident's removal was not addressed in the record.[3] Defendants argued Donoian's plan constituted an admission that plaintiff was "housing people inappropriate [sic] for this facility." They maintained that, regardless of whether plaintiff modified the upper three floors, there were residents on those floors unable to self-evacuate. And potentially 75 bedbound residents on the second and third floors would require

---

[3] Apparently, a video addressing the safety removal equipment was submitted to the trial court but was not preserved in the lower court record.

assistance from at least one staff member.  Further, there would be over 225 lift transfers involved to evacuate the residents, which would overload the staff members at the facility.

Frank Bayer, a certified building official in Sterling Heights, averred the facility was noncompliant with the I-1 condition 2 occupancy and the "proposed use of [six] chairs and [eight] employees for possible evacuation of 75 patients in less than [one] hour is not only impractical but extremely unsafe."  He also averred two employees would have to move each resident to an evacuation chair.  Bayer stated the refuge area for this classification was only required to be 15 square feet because it did not include bedridden individuals.  He stated the facility should be classified as I-2 condition 1 occupancy; however, the facility also did not meet the requirements of this classification.  Champagne averred having eight staff members assisting "72 vulnerable persons would result in a high risk of serious injury or death to the residents of [the] facility, staff members[,] and fire fighters."  Ronald A. Syme, Jr., A.I.A., a project architect, opined the facility was incapable of achieving an I-1 condition 2 classification.  Syme opined the residents on the upper three floors were "bedbound" and unable to evacuate even with limited assistance.  Because the residents could not self-evacuate, he opined the proper classification was I-2 condition 1.

Whether plaintiff improved the facility, such as by installing evacuation chairs, the trial court's approval of plaintiff's proposed plan was premature.  The record did not clearly indicate how many residents were (a) bedridden and required assistance to evacuate, (b) not bedridden but otherwise required assistance to evacuate, and (c) able to self-evacuate.  It did not establish how plaintiff's plan constituted only limited assistance under the codes.  Plaintiff must demonstrate precisely how it plans to execute the evacuation.  That necessarily mandates an understanding of which residents require assistance, if any.  The classification assigned to the facility is meaningless if the residents cannot meet the criteria for self-evacuation.

Defendants argue plaintiff's plan improperly allowed residents to shelter in place in stairwells during an emergency, which is impermissible under the codes because residents are required to perform a complete building evacuation.  Defendants take exception to the trial court's December 19, 2024 opinion and order to the extent it approved plaintiff's plan:

> Plaintiff proposes to have at least eight staff members on the second and third floors who will be able to maneuver residents from their beds to evacuation chairs.  The evacuation chairs can then be wheeled to a stairwell to shelter in place as would residents in wheelchairs.  Consequently, plaintiff's plan—including the necessary updates to the second and third floors of the facility from Institutional Group I-1 Condition 1 occupancy designation to Institutional Group I-1 Condition 2 occupancy designation—would permit bedridden residents to occupy the second and third floors.

Further, defendants contend the trial court's opinion and order denying reconsideration was erroneous because it approved plaintiff's plan to allow residents to remain in stairwells during an emergency.  The trial court explained:

The act of guiding/assisting the transfer of residents from their beds to the [evacuation chairs] constitutes the provision of limited physical assistance. The subsequent use of the [evacuation chairs] to facilitate the more expeditious movement of residents, as would be necessary in an emergency situation, does not transform the level of physical assistance being provided.

Significantly, defendants acknowledge the second-floor stairwell has sufficient space to provide a refuge area for more people than can reside on the second floor. While the third-floor stairwell purportedly lacks sufficient space to provide a refuge area for all the people that can reside on the third floor, defendants ignore the fact that all of these residents will not be seeking refuge at once. Indeed, plaintiff has proposed providing sufficient staff to immediately begin evacuating those needing such assistance. As such, the residents will not be sheltering in place in the stairwells to await rescue.

Moreover, defendants' third-floor refuge area capacity calculations are limited to stairwell landing spaces. However, Michigan Building Code § 420.4.1 provides the calculations are to also consider "corridors, lounge or dining areas and other low-hazard areas". Inasmuch as defendants' calculations exclude these other potential areas, the calculated capacities do not prove a lack of sufficient refuge area exists on the third floor.

The trial court entered a judgment, which incorporated its earlier opinion and order by reference.

The plain language of the I-1 condition 2 occupancy under section 308.3.2 of the 2015 MBC, as well as the 2015 IFC provision governing I-1 condition 2 occupancy, requires a "complete building evacuation." Although the trial court's opinion stated that residents would not be sheltering in place awaiting rescue, there were no factual findings identifying the number of employees necessary to remove a resident through the use of an evacuation chair or board, the time frame for complete evacuation through the use of the evacuation chairs and boards, and the number of residents that needed to be completely evacuated from the facility because of their physical limits. Because of the lack of information regarding the number of employees to attend to the respective residents and the time frame involved, it was unclear whether residents would be taking refuge in the stairwells. Moreover, the trial court did not address whether the applicable building code required the facility employees to perform the complete evacuation or whether refuge in the stairwell was permissible while waiting for first responders. Thus, further factual development is required regarding the number of residents requiring assistance to evacuate during an emergency, and the precise methods the eight staff members are to use to assist those residents in exiting the facility. That will allow a proper resolution of whether plaintiff's plan complies with the codes for status as a I-1 condition 2 occupancy.

In light of the factually deficient record,[4] the trial court erred by approving plaintiff's plan as constituting limited assistance under the I-1 condition 2 use occupancy classification.

Vacated and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Michael F. Gadola
/s/ Michael J. Riordan
/s/ Anica Letica

---

[4] On appeal, plaintiff contends that defendants inappropriately attached documentary evidence not presented to the trial court. A party may not expand the record on appeal, *Detroit Leasing Co v Detroit*, 269 Mich App 233, 237; 713 NW2d 269 (2005), and we have not considered this evidence.